No. 22,644.

PETE CUNNINGHAM et al., *Appellants*, v. LOGAN CUNNING-
HAM et al., *Appellees*.

### SYLLABUS BY THE COURT.

1. WILL—*Action to Set Aside—Mental Incapacity—Undue Influence.*
In an action to set aside a will on the ground that the testator was
mentally incompetent and unduly influenced, the record is examined
and held to show abundant evidence to sustain a finding upholding
the will.

2. SAME—*Lawyer Who Drew Will Competent Witness.* Rule followed
that in an action to set aside a will, the lawyer who drew it may relate
the facts and circumstances surrounding the preparation and execu-
tion of the will to show that the testator was not under any improper
restraint, and that he is a competent witness as to the mental condi-
tion of the testator. (*Black v. Funk*, 93 Kan. 60, 143 Pac. 426; *Durant
v. Whitcher*, 97 Kan. 603, 156 Pac. 739.)

3. SAME—*No Error in Admission of Evidence.* Rulings as to the ad-
mission of testimony examined, and held to be without error.

Appeal from Elk district court; ALLISON T. AYRES, judge.
Opinion filed July 10, 1920. Affirmed.

*J. D. McBrian,* of Sedan, and *S. H. Piper,* of Independence,
for the appellants.

*J. A. McHenry,* and *C. B. Crawley,* both of Howard, for the
appellees.

The opinion of the court was delivered by

PORTER, J.: The ten plaintiffs are the children and heirs-
at-law of Harvey Cunningham, deceased, and the thirty-four
defendants are his grandchildren. The plaintiffs seek to set
aside the will of their father on the ground that at the time
it was executed he was mentally incompetent and under undue
influence. The court submitted to a jury, in an advisory ca-
pacity, two questions: *first,* whether at the time the will
was executed the testator was of sound and disposing mind
and memory, which they answered in the affirmative; *second,*
whether the testator was unduly influenced by any person in
making the will, which the jury answered in the negative.
The court approved the verdict, adopted the findings upon

these questions, and further, found all the issues in favor of the minor defendants and against the plaintiffs. The plaintiffs appeal.

Harvey Cunningham was an old resident of Elk county, and the evidence shows that he was a man of strong and forceful character, had taken an active part in local affairs, and had frequently been a delegate to political conventions. He owned about 1,920 acres of land in Elk and Chautauqua counties which, aside from the homestead, consisted wholly of pasture lands. At the time the will was executed he was 88 years of age. His wife had died a few months before, and he was greatly affected by her death. There was evidence offered by the plaintiffs indicating that he had hallucinations; that he was worried over the belief that his wife had been prematurely buried, and that he frequently asked to be taken to the cemetery, that the grave be opened, and that apparently he would not be satisfied until he knew that his wife had not turned over in her coffin or he was assured that she had not been smothered. The will was executed on the 12th day of September, 1917. He died about two months later. His son, Pete Cunningham, was the only one of the family who had remained at home, and for many years Pete and his family had lived at the home place. In order to compensate them for their trouble and services, Mr. Cunningham, at the time he executed the will, and as part of the same transaction, executed a deed conveying to Pete the 160 acres comprising the homestead and 160 acres of the pasture land, and stated in his will that by reason of this provision neither Pete nor his children should take anything under the will. After giving his personal property to a daughter and son, he devised all his real estate to Pete Cunningham in trust to hold and dispose of as directed in another provision. The trustee was directed to rent and manage the real estate according to his own judgment, and annually divide and apportion the net rents and profits among the testator's children and certain of his grandchildren.

The will contained the further provision that should any child or grandchild contest the will, the one so contesting should take no portion of the estate, that portion to be divided among the remaining devisees. There was a provision that

Pete Cunningham should receive for his services as trustee under the will the sum of $100 annually, and he was named as executor of the will. Immediately after the death of Harvey Cunningham, the plaintiffs agreed among themselves to ignore the rights of the grandchildren (including their own children) and made an offer to Pete Cunningham that if he would consent to this he was to be allowed to retain the land given him by the deed and to share equally with the others in the rest of the real estate. It was agreed that he should qualify as executor, that the will should be probated, and that afterwards a suit should be brought to set aside the will on the grounds stated in the petition.

On the trial Pete Cunningham and several of the plaintiffs testified that this agreement was entered into; that they agreed among themselves that by this method they could take the lands in fee simple; and that they disregarded entirely the rights of the grandchildren and did not consult with them. Pete Cunningham also admitted that before this agreement was made he had retained an attorney to defend the will in case an attempt was made by any of the heirs to set it aside.

The grandchildren, among other contentions, insist that the appeal should be dismissed and the judgment affirmed on the ground that Pete Cunningham, having accepted the real estate deeded to him by his father as part of the same transaction, and having accepted the trust imposed by the will by qualifying as executor, comes into court with hands that are unclean; that the agreement between him and his brothers and sisters to set aside and ignore the will is one which under the circumstances equity should not enforce. Authorities are cited where it has been held that contracts of this kind are void as against public policy because they amount to a breach of faith on the part of the trustee. The court, however, found all the issues in favor of the defendants; the answer had alleged that Pete Cunningham was estopped by his conduct to maintain the action, and that three of his brothers who had become sureties on his executor's bond were also likewise estopped. In view of the fact that the record discloses such an abundance of evidence to sustain the findings made by the jury and the court upholding the validity of the will, we deem

it unnecessary to pass upon the question of estoppel or the question of public policy presented.

Some years prior to the making of the will, Harvey Cunningham had executed a will to which he had attached, at different times, seven codicils. A day or two before he made his last will he went in a car with Pete to Moline, and at his request the banker who had charge of the old will came out and talked with him. He told his banker that he wanted to make a deed to Pete to the home place and some other lands and wanted it done as quickly as possible. His banker, who had been his friend for thirty years, told him that this would probably interfere with his will—might necessitate the making of a new one. He asked the banker if he could attend to the matter of making a new will, but the latter told him it was an attorney's business, and suggested Mr. Sims, an attorney. It was agreed that the banker would make arrangements with Mr. Sims, and on the following day the banker brought the attorney to the Cunningham home. The attorney, in the meantime, had read the old will and advised Mr. Cunningham that there ought to be a new one written in place of having an additional codicil to the old will.

The testimony of Pete Cunningham, so far as it tended to show that his father was not mentally sound, was largely discredited by his admissions that although he and other members of the family were present at the time the will was talked over and when it was executed, none of the family suggested that the old gentleman was not competent to make a will; that Pete never suggested that his father was not capable of making the deed to him which he accepted, recorded and claimed title under, and also by the uncontradicted testimony showing that some time after the will had been executed, Pete retained the services of Mr. Sims, the attorney who drew the will, to defend any action that might be brought by anyone to defeat the will.

The deposition of Mr. Sims, the attorney, was taken and read on behalf of the defendants. He told what occurred at the first interview, and the reasons stated by the testator for making the provisions with respect to the disposition of his real estate. In substance, Mr. Sims testified that Mr. Cun-

21—107 Kan.

ningham said he wanted to fix it some way so that his children, except Mrs. Bryan and one son in Colorado, should get the rents and the profits of the pasture land; that he told the attorney the number of acres of land that he owned, and the attorney suggested to him that this would amount to over 160 acres for each of the children after giving Pete the lands spoken of, and suggested that it would be a good thing for him to divide the land himself and let each child have certain pieces of the land; that Mr. Cunningham said, in reply:

" 'That is not a good way to handle it, the land is nearly all in one big pasture and it ought to be kept and used together as one body,' that some parts of it was much better than others, some had water on it, other parts did not, and it would be almost impossible to divide the land equitably.

"I then said to him, 'If you fix this land as you are talking it will be held together here and won't be divided for forty or fifty years,' and he said [with an oath], 'that is just the way I want it, they won't get to spend it and run through with it and them little grandchildren will get it.' He said, 'They will say I am crazy because I don't let them have it themselves so they can spend it, but I want them little grandchildren to get that property after they are through with it and all get their share.' "

## The witness further testified in substance:

"I asked him if he wanted to pay anything and, if so, how much, (to Pete for acting as trustee) and the old gentleman called Pete . . . and asked how much he thought he ought to have . . . and Pete said he thought $150 would be all right and the old man said, 'That is too much, $100 is enough.' . . . I further said to him, 'If they are going to say you are crazy you ought to have some of your old neighbors who know you best act as your witnesses,' . . . and I told him I thought it would be best to have at least four. He said that Andy McKay of Longton was one of his best friends and he would like mighty well to have Andy. That Phil Arnall of Elk Falls was another good friend but he guessed he lived too far away. I said to him, 'Mr. Cunningham, you leave that to me, if you want these men to act as witnesses I'll see that they get here' and he said 'All right.' . . . I said to him, It would probably be a good idea to have his family physician and asked him who he was. He said . . . Dr. Shaffer had been waiting on him some. I asked him if I should bring Dr. Shaffer out and he said 'Yes,' if I thought it necessary; that he wanted to fix it so they couldn't say that he was crazy."

The testimony of the attorney as to what occurred the following day, after he had stated to Mr. Cunningham that the witnesses were there to witness the will, is:

Cunningham v. Cunningham.

"I said to him, 'What do you want to give Pete?' and he said, 'The home place and 160 acres of pasture land' . . . I asked him what he wanted done with his personal property, and he said give it to the son in the West . . . and Mrs. Bryan. I asked him what he wanted done with the balance of his pasture land, and he said he wanted to keep it together in one body, Pete to look after, pay the taxes and divide the proceeds up equally among all his children except Sarah Bryan and his son in the West and Pete, . . . how much he wanted Pete to have for taking care of the pasture, and he said '$100 a year' . . . how long he wanted the pasture land kept together and rented, and he said as long as any of his children lived . . . what he wanted done with the pasture land after his children were all dead, and he said to divide it among his grandchildren. I asked him to tell the witnesses what he wanted done if any of his children brought suit to set aside the will, and he said to cut them off without anything."

Several of the witnesses to the will testified in substance that they saw nothing to indicate that the testator did not know what he was doing at the time he executed the papers— the deed and the will.

One of the contentions urged by the plaintiffs is that the testimony concerning communications between the attorney and client was incompetent under section 321 of the civil code (Gen. Stat. 1915, § 7223). We think the objections to his testimony and the motion made to strike out were properly overruled. In addition to the fact that many of the things the attorney testified to were corroborated by other testimony, it has been decided that an attorney who acts as a scrivener in the preparation of a contract regarding property or in the drawing of a will may testify to communications with the deceased at the time the deed or will was prepared or executed, because under such circumstances the communications are not privileged. (*Black v. Funk*, 93 Kan. 60, 143 Pac. 426; *Sparks v. Sparks*, 51 Kan. 195, 32 Pac. 892; *Lumber Co. v. Cox*, 94 Kan. 563, 566, 147 Pac. 67; 4 Wigmore on Evidence, § 2297.)

In *Durant v. Whitcher*, 97 Kan. 603, 156 Pac. 739, the rule was applied that "in an action to set aside a will the lawyer who drew it may testify to the conversation had at the time between himself and the testator" (syl. ¶ 1), and also that the scrivener and subscribing witnesses of a will are competent witnesses as to the mental condition of the testator.

In *Black v. Funk*, supra, it was said:

"Communications received from the testator not being privileged, it is manifest that the attorney may relate the facts and circumstances

surrounding the preparation and execution of the will to show that the testator was not under any improper restraint." (p. 63.)

One of the witnesses for the plaintiff was Mrs. Stuckey, a daughter of the deceased. The court sustained a number of objections to parts of her testimony and struck out other parts of it. It is complained that the testimony was improperly excluded. No error was committed in the rulings. The court properly struck out testimony of communications between the daughter and her father, in his lifetime, but permitted her to testify to statements by him to other persons in her presence. There was no error in the court admonishing her to tell what she observed, in place of giving her opinion as to the condition of her father's mind. Many of the statements stricken out were mere conclusions and opinions. She was permitted, however, to testify that her father was not in his right mind and that his mental condition had been the same for about six months prior to the execution of the will.

There is no force in the contention that the court erred in the instructions to the jury. The findings submitted were merely advisory, and the views of the court, as reflected by the instructions, show that the court fully understood and applied the law of the case. The instructions were fair and fully covered the issues submitted to the jury.

Mary Ellen McMillan, one of the plaintiffs, has filed a motion asking to be dismissed as an appellant and stating in an affidavit that she never authorized the use of her name as a plaintiff in the court below and never authorized an appeal in her behalf. As to the authority for the appeal she is contradicted by an affidavit of one of appellants' attorneys. The minor defendants also resist the motion and direct attention to the record showing her presence during the trial in the district court and a statement in her presence by her sister, Mrs. Stuckey, while a witness, to the effect that her sister, who was present in the court room, had agreed with the other plaintiffs about the settlement of the estate. It is also said that a similar motion was presented to the trial court after the rendition of the judgment, and that it was overruled. In view of these facts, there seems nothing for us to do but to overrule the motion.

Finding no error in the record, and the judgment being supported by sufficient evidence, it is affirmed.